**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard A. Adams, | No. CV-05-757-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| Belden Communications Company, a Delaware corporation, et al., | |
| Defendants. | |

Plaintiff Richard Adams has sued his former employer, Belden Communications Company ("Belden"), for alleged violations of the Americans with Disabilities Act and other torts. Doc. #1. Belden has moved to dismiss Adams' complaint because Adams allegedly has lied to defense counsel and the Court. Doc. #27.

**Factual Background**

Adams filed this case as a *pro se* plaintiff on March 10, 2005. Doc. #1. Following service of process and an extension of time to respond, Belden answered on June 3, 2005. Doc. #8. The parties filed a joint case management report on July 25, 2005 and a case management conference was scheduled for August 24, 2005. Docs. ##11, 13.

At the beginning of the case management conference, counsel for Belden made an unusual allegation. He informed the Court of his belief that another individual had been impersonating Adams in communications with defense counsel. He pointed to a gentleman sitting in the Court's gallery behind the defense table, identified him as Roger A. McKee,

a former Arizona lawyer who is no longer authorized to practice law, and asserted that McKee had been impersonating Adams in various communications with Belden's counsel. This accusation set in motion a chain of events that has consumed a substantial amount of the Court's and the parties' time.

At the close of the case management conference, counsel for Belden served a subpoena on McKee that required him to appear for a deposition on September 14, 2005. In response to the subpoena, Adams and McKee filed a motion to quash and a motion for protective order. Docs. ##23-24. Belden filed a response on September 28, 2005, along with a motion to dismiss the case based on Adams' allegedly misleading actions. Docs. ##26-27. The Court scheduled a hearing on these matters for October 19, 2005. Doc. #30. When Adams and McKee failed to appear, the Court rescheduled the hearing for October 21, 2005. Docs. ##35, 39.

Adams and McKee appeared on October 21, 2005 with attorney Franzula Bacher. Doc. #43. Ms. Bacher stated that she had agreed to represent both Adams and McKee and requested additional time to respond to the issues raised by Belden. The Court established a schedule for Ms. Bacher's responses and set another hearing for November 1, 2005. Doc. #37. Five days later, on October 26, 2005, Ms. Bacher moved to withdraw from representing Adams and McKee. Doc. #31. The parties continued to file briefs on a variety of issues, including the motion to quash, the motion to dismiss, and motions seeking various forms of discovery.

At the hearing on November 1, 2005, the Court permitted Ms. Bacher to withdraw. The Court granted additional time for Adams and McKee to comply with the Court's previous Order (Doc. #37), but cautioned that further extensions would not be granted. The Court scheduled a hearing on the various motions for November 29, 2005. Doc. #45. Adams, McKee, and counsel for Belden appeared at the hearing. The Court heard arguments from the various participants.

**Discussion**

**I.    Adams' Deception.**

On the basis of the extensive briefing submitted by the parties, including affidavits from Adams, McKee, counsel for Belden, and others, as well as statements made to the Court at various hearings, the Court concludes that Adams has knowingly made false statements to the Court and Belden. The Court will first recount its findings. The Court will then address the appropriate sanction.

**A.    Statements Regarding the Participation of Attorney Lynn Laney.**

As noted above, counsel for Belden first made accusations against Adams at the case management conference on August 24, 2005. Specifically, counsel for Belden asserted that McKee had been impersonating Adams in conversations with Whitney Sedwick, one of the attorneys for Belden. When the Court called on Adams for a response, the following exchange occurred:

| | |
|---|---|
| THE COURT: | All right. Mr. Adams. |
| MR. ADAMS: | Yes, sir. |
| THE COURT: | Stand up while you address the Court. Have you conferred with Mr. Gilbert or Ms. Sedwick in the preparation of the case management report? |
| MR. ADAMS: | Yes, sir, I've been conferring but Lynn – Lynn Laney has been helping me and he has had others help me to do it as we – |
| THE COURT: | I can't hear you. You need to – there you go. |
| MR. ADAMS: | Okay. Sorry. I have – Lynn Laney has been helping me to – at no cost at this point for himself, but he has helped me in process to it. I have also been encouraged by Roger to help me prepare it, and although I've been in process of listening to [Ms.] Sedwick – Sedwick I believe her name is. I've talked to her many times. I've concurred that these are my – my consider – considerations. And considered when she wanted extra time, I gave her extra time. |
| THE COURT: | Let me have you come to the podium so we can hear you more clearly. |
| MR. ADAMS: | Here? |

| | | |
|---|---|---|
| 1 | THE COURT: | Yeah, right there. I'm losing track of names. Who has helped you? |
| 2 | MR. ADAMS: | Pardon? |
| 3 | THE COURT: | Who has helped you? |
| 4 | MR. ADAMS: | Lynn Laney. |
| 5 | THE COURT: | Who is Lynn Laney? |
| 6 | MR. ADAMS: | An attorney. |
| 7 | THE COURT: | Is he here today? |
| 8-11 | MR. ADAMS: | No, but he's – he's in Roger – I can't think of his name. Roger, the one behind me, he has been – he has been working with several lawyers and I've had several lawyers I've talked to. I paid $30 to get consultation, which will be found out later some of the things that have been said. |
| 12-13 | THE COURT: | Okay. So a fellow by the name of Lynn Laney has helped you, correct? |
| 14 | MR. ADAMS: | Lynn Laney, yes. |
| 15 | THE COURT: | And is he a member of the bar? |
| 16 | MR. ADAMS: | I believe he is. |

Doc. #27 Ex. U, 8/24/05 Hr'g Tr. at 2-4.

Following these clear assertions by Adams, counsel for Belden provided the Court with an affidavit from attorney Lynn Laney stating that he had neither met nor conferred with Richard Adams and was not representing Adams in any capacity. *Id*. Ex. X ¶ 3. Adams subsequently submitted a second affidavit from Laney, but this too confirms that Laney did not meet, speak to, assist, or represent Adams at any time in this case. Doc. #49 Ex. 1.

The Court concludes that Adams knowingly made incorrect statements to the Court when he asserted on August 24, 2005, that Lynn Laney had been helping him. Adams knew that he had never spoken with Laney and that Laney had not helped him. Adams has argued that he was confused by the Court's questions about Laney, but the transcript quoted above shows that Adams said Laney was helping him before the Court asked any

- 4 -

questions about Laney. At the hearing on November 29, 2005, Adams confirmed that he did not believe at the August hearing that Laney was representing him in this case:

> THE COURT: Before we had the first hearing in this courtroom, did you believe that Mr. Laney was your lawyer?
>
> MR. ADAMS: No, I did not.

11/29/05 Hr'g Tr. at 9.[1]

### B. Statements Regarding the Tempe Lawyer.

In response to Belden's attempt to depose McKee, Adams and McKee filed a motion to quash. They argued in the motion that a deposition of McKee would invade the attorney-client privilege because McKee had been assisting Adams under the supervision of a Tempe lawyer whom they did not name. The assertion was unequivocal. Adams stated in a sworn declaration that the Tempe lawyer told Adams that he could not take Adams' case before a complaint was filed, but "suggested that Roger McKee, whom he uses from time to time as a paralegal, might help [Adams] without any fee, as a pro bono or a free service, *under the Tempe lawyer's supervision.*" Doc. #23 at 2 (emphasis added). Adams further swore that "*[t]hrough the Tempe lawyer*, McKee did provide me with some legal assistance in preparing documents for my case which were sent to the Tempe lawyer." *Id* (emphasis added). McKee also asserted that he had been working under the supervision of the Tempe lawyer. He stated in a sworn declaration, provided to the Court by Adams, that "I did provide some pro bono legal assistance to Mr. Adams *under the supervision of the Tempe lawyer.*" *Id.* at 4 (emphasis added). Finally, the motion to quash signed by Adams expressly argued that "communications between Adams [and McKee] fell under the attorney-client privilege *since McKee was working under a licensed Tempe lawyer as a paralegal when the communications were made.*" *Id.* at 7 (emphasis added).

In response to these unambiguous assertions and to evaluate Adams' claim of

---

[1] This citation is to the Court's rough copy of the transcript provided by the reporter. Pagination may change in the final version.

- 5 -

1  privilege, the Court ordered Adams to identify the Tempe lawyer. Doc. #37 ¶ 1. The Court
2  further ordered Adams to provide a sworn confirmation from the Tempe lawyer that the
3  facts set forth above were true. *Id.* Adams subsequently provided a declaration from the
4  Tempe lawyer, but it did not confirm the truth of Adams' and McKee's representations.
5  The Tempe lawyer, David C. Larkin, provided the following sworn statements:

- "I did not say that I would supervise McKee and in fact did not do so." Doc. #49 Ex. 2 at 6.
- "I did not supervise McKee. I only received the documents he helped Mr. Adams to file <u>after</u> the Adams' lawsuit was filed[.]" *Id.* at 7 (emphasis in original).
- "I deny any inference that I supervised [McKee] regarding Mr. Adams' claims or represented Mr. Adams at any time, or told anyone that I was supervising McKee or representing Mr. Adams." *Id.*
- "I never supervised McKee in the Adams case and never told anyone that I did." *Id.*

13  The Court finds that Adams made false statements to the Court when he
14  affirmatively stated under oath that McKee had been assisting him under the supervision
15  of a Tempe attorney. Adams confirmed at the hearing on November 29, 2005 that he has
16  never been represented by Larkin:

17  THE COURT:    Before we had our first hearing in this courtroom, did you believe that Mr. Larkin was your lawyer?
18
    MR. ADAMS:    No, your honor, I did not.
19

20  11/29/05 Hr'g Tr. at 8-9.

21  **C.  Statements Regarding McKee's Impersonation of Adams.**

22  Belden has asserted repeatedly that McKee impersonated Adams in telephone
23  communications with Belden's counsel. Adams has denied this assertion. Again, Adams'
24  statements to the Court have been unequivocal. In his response to Belden's motion to
25  dismiss, Adams stated that "McKee did assist Adams, *but never in any way impersonated*
26  *Adams*." Doc. #49 at 1 (emphasis added). Adams' response further stated that both
27  Adams and McKee have "*steadfastly denied in sworn declarations that McKee ever*
28  *impersonated Adams*[.]" *Id.* at 2 (emphasis added). Adams' response included a sworn

- 6 -

1 declaration from McKee stating that "*I never impersonated Mr. Adams to Whitney
2 Sedwick or anyone else.*" *Id.* at 6 (emphasis added).

3 As an exhibit to its motion to dismiss, Belden provided the Court with a tape
4 recording of two voice messages left on the phone of Belden's counsel. Both voice
5 messages purport to be from Adams. Belden asserts that they are different voices, one of
6 McKee and one of Adams. Belden made these assertions in its motion to dismiss, before
7 Adams responded with the above-quoted denials. Thus, Adams knew of the taped
8 messages when he told the Court that McKee had never impersonated him.

9 The tape was played during the hearing on November 29, 2005. To ensure that he
10 could hear properly, Adams wore a court-provided hearing device while the tape was
11 played. The tape includes a message left with Belden's counsel on August 1, 2005, as
12 follows:

13 > This is Richard Adams. It's Monday afternoon, at about 3:40. I got your
> message. I was returning your call. I just – well, just returning your call. I'm
14 > going to be out most of the rest of the afternoon, but you can leave me a
> message, or send me a note by fax and I'll get back to you. Okay. Bye.
15

16 11/29/05 Hr'g Tr. at 18.

17 The tape also includes this message left with Belden's counsel on September 13,
18 2005:

19 > Hello, this is Richard Adams. I'm calling to let you know that I won't be
> appearing tomorrow for the deposition for Roger McKee because I am filing
20 > for a motion to cancel the subpoena, which will not – which will need to be
> briefed and decided by the Court, so neither Richard nor myself nor Roger will
21 > be there. Thank you. Have a nice day. Bye.

22 *Id.* at 18-19.

23 The voices on these two taped messages sound different. After the tape was
24 played in court, the following exchange occurred. The Court will quote at some length
25 because the progression and evolution of Mr. Adams' responses is significant:

26     THE COURT:    Did you listen to the tape as it was played?

27     MR. ADAMS:    Yes, your honor, and you notice since the last time I was here,
my voice is changing because of the way I speak. I only know
28     I called Ms. Sedwick.

- 7 -

| | | |
|---|---|---|
| 1 | THE COURT: | So is it your – well, let me ask you this: You had the hearing aids on as you listened to the tape a minute ago, correct? |
| 2 | MR. ADAMS: | I'm sorry, I didn't hear you; what? |
| 3 4 | THE COURT: | You had the hearing aid on as you listened to the tape a minute ago, is that correct? |
| 5 | MR. ADAMS: | Yes, your honor. |
| 6 | THE COURT: | Could you hear the tape? |
| 7 | MR. ADAMS: | I could hear it in relationship that I heard the comments, yes. |
| 8 | THE COURT: | Were both of those messages left by you? |
| 9 10 | MR. ADAMS: | I intentionally don't – I don't know how to say it. I had no idea if it was done – I didn't have no – understanding what was being done. |
| 11 12 | THE COURT: | My question to you, Mr. Laney, is whether the two messages that we just listened to on the tape were both left by you. |
| 13 | MR. GILBERT: | Your honor, for the record, I think you misspoke. You said Mr. Laney, instead of Mr. Adams. |
| 14 15 | THE COURT: | Thanks, I apologize. Let me say that over again. Mr. Adams, my question for you is whether the two messages we just listened to on the tape were left by you. |
| 16 17 | MR. ADAMS: | Well, to my knowledge, I've called a couple of times, and I've left messages on the machine. |
| 18 | THE COURT: | Did you recognize both of those messages that we just listened to as being your voice and messages that you left? |
| 19 | MR. ADAMS: | Your honor, I don't know what you mean. |
| 20 21 | THE COURT: | Well, you were here a moment ago when we played the tape, and there were two recorded messages played; correct? |
| 22 | MR. ADAMS: | Yes. |
| 23 | THE COURT: | Could you hear them? |
| 24 | MR. ADAMS: | Yes, your honor. |
| 25 | THE COURT: | Could you hear them? |
| 26 | MR. ADAMS: | It was muffled. |
| 27 | THE COURT: | Do you want to hear them again? |
| 28 | MR. ADAMS: | No, your honor. |

- 8 -

| | | |
|---|---|---|
| 1 | THE COURT: | Were both messages left by you? |
| 2 | MR. ADAMS: | Well, your honor, could I ask you a question? |
| 3 | THE COURT: | You may. |
| 4 | MR. ADAMS: | In regards to it was an answering machine. An example, could I give you an example, your honor? |
| 5 | THE COURT: | Sure. |
| 6 | MR. ADAMS: | If I was at your office, I called someone up, and I was standing to wait for you, and someone called and they left a message on the machine, would you say that wrong, your honor? |
| 8 | THE COURT: | Would I say what? |
| 9 | MR. ADAMS: | Would you say that would be wrong? In other words, saying who they were. In other words, instead of saying I'm here representing so forth, my feelings was that had he said – that McKee was actually saying that it was Richard Adams. I was present, had someone answer it. I would have said Mr. Adams is here, and I would have said Mr. Adams is here in representation, so that's the only thing I know, your honor. |
| 13 | THE COURT: | So are you saying, Mr. Adams, that there were occasions when McKee spoke for you with you present? |
| 15 | MR. ADAMS: | At my son's work, your honor, but we just answered the phone and the machine was – it was busy, so it was left. |
| 16 | THE COURT: | Who left the message? |
| 17 | MR. ADAMS: | Mr. McKee. |
| 18 | THE COURT: | And he left the message saying that it was Mr. Adams leaving the message? |
| 20 | MR. ADAMS: | Well, I think he left it in relationship to I would have picked up and said yes, Mr. Adams, that he had dialed it, and it rang and an answering machine, so he left it that way. I should have said it was okay to say something, but that's the way it happened, your honor. |
| 23 | THE COURT: | Okay. So of the two messages we just listened to, you're saying that one of those was the voice of McKee? |
| 24 | MR. ADAMS: | Yes, your honor. |
| 25 | THE COURT: | And was the other one your voice? |
| 26 | MR. ADAMS: | Yes, your honor. |
| 27 | THE COURT: | The one that was left by McKee, where were you when that message was left? |

- 9 -

| | | |
|---|---|---|
| MR. ADAMS: | | We were both at my son's office, your honor, and I was standing right by the telephone. |
| THE COURT: | | But it was Mr. McKee who was making the call; is that right? |
| MR. ADAMS: | | Well, he dialed it, and because the answering machine run, he took it, because he knew how to talk. |
| THE COURT: | | All right, and you heard him say on the message that it was Mr. Adams. |
| MR. ADAMS: | | Yes, sir, and I kind of wondered about it, but I felt, well, I don't know – here's why I felt it would be okay. For instance, now with my son were to for instance call a collector and he they wanted to know about my contact, they would ask if it was okay. I was there in case someone said okay, so I thought it was all right. I'm not trying to deceive the Court, your honor. I just didn't under – know the policies of the Court. |

11/29/05 Hr'g Tr. at 23-27.

The Court finds that Adams was evasive in these responses. He first asserted that his voice was changing, an apparent explanation of the obvious differences in the voices on the two recordings; he then said he had called Ms. Sedwick a couple of times and left messages on her machine, an evasive way of suggesting that both recorded messages were in fact his; he then said he didn't know what the Court meant when the Court asked him if he recognized both messages as being his voice; he then asked the Court a hypothetical question, testing whether or not it would have been improper for him to knowingly permit McKee to impersonate him in the voice message; finally, Adams admitted that McKee impersonated him in the first message and that he was present when it happened.

Given this final admission, the Court concludes that Adams knowingly made false statements to the Court when he earlier stated that "McKee did assist Adams, *but never in any way impersonated Adams*," and when he "*steadfastly denied in sworn declarations that McKee ever impersonated Adams*." Doc. #49 at 1-2 (emphasis added). Adams made a further false statement to the Court when he submitted McKee's sworn declaration that "*I never impersonated Mr. Adams to Whitney Sedwick or anyone else*." *Id*. at 6 (emphasis added).

- 10 -

Some may argue that Adams' allowing McKee to impersonate him in a phone message is not a serious matter. The Court believes that any undisclosed impersonation is improper, but that is not the point here. Lying to the Court is serious under any circumstances. Adams unambiguously asserted to the Court that McKee had never impersonated him in any way, a fact he knew was not true.

### D. Statements Concerning the Location of Fax Machines.

In preparation for the case management conference, Adams directed Sedwick to fax documents to 602-864-3389. When Sedwick became suspicious that this was a fax number located at McKee's office, rather than Adams' home, she asked Adams where the fax machine was located. Adams asserted that the fax machine was located at his home. Doc. #27 Ex. A ¶ 7. This was not true. McKee confirmed to the Court that the fax number is his. 11/1/05 Hr'g Tr. at 20.

### E. Other Troubling Facts.

Counsel for Belden have recounted other instances where McKee allegedly impersonated Adams or Adams made knowingly false statements about communications between him and Belden. Docs. ##27, 55. The Court will not attempt to address each of these allegations, but finds in them a troubling pattern consistent with the false statements identified above.

Counsel for Belden have also provided the Court with an order in *Roberts v. Albertsons, Inc.*, No. CIV-04-2308-PHX-MHM (August 24, 2005), in which Judge Mary Murguia dismissed a *pro se* plaintiff's complaint after finding that the plaintiff had permitted McKee to impersonate her in communications with the Court and opposing counsel. Doc. #27 Ex. AA. The *pro se* plaintiff in that case admitted to Judge Murguia that she had permitted McKee to impersonate her in various communications. *Id.*

## II. Analysis and Conclusion.

Dismissal is a drastic remedy that should be used only in extreme cases. This, however, is an extreme case. The Ninth Circuit has recognized that "courts have inherent power to dismiss an action when a party has wilfully deceived the court and engaged in

conduct utterly inconsistent with the orderly administration of justice." *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995) (citations omitted).

Five factors must be considered before an action is dismissed as a sanction: (1) the public's interest in expeditious resolution of litigation, (2) the Court's need to manage its docket, (3) the risk of prejudice to the party seeking sanctions, (4) the public policy favoring disposition of cases on their merits, and (5) the availability of less drastic sanctions. *Id.* at 353. The Court concludes that (1) litigation will be prolonged (and in this case has been prolonged) by parties attempting to mislead the Court and opposing counsel; (2) courts cannot manage their dockets effectively if parties attempt to deceive them; (3) parties are prejudiced when their opponents lie; (4) cases cannot be disposed of on the merits when parties lie; and (5) sanctions less drastic than dismissal are not likely to have the deterrent effect needed when parties lie.

Moreover, the foregoing five factors appear designed to address litigation or discovery tactics that may prolong the litigation or disadvantage an opposing party. Presenting deliberate falsehoods to a court is an offense of a higher magnitude. Courts are fora for determining the truth. The judicial system cannot function if parties are permitted to lie. This is not a case in which Adams engaged in a single reckless misstep. Adams presented several deliberate and clearly false statements to the Court, some of them under oath. The Court concludes that such attempted deception cannot be tolerated and that the only appropriate sanction is dismissal of Adams' complaint. *See id.* at 348-55 (holding that the district court acted within its discretion in dismissing a counterclaim based on the claimant's "pattern of deception" because "[i]t is well settled that dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings"); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (affirming the dismissal of a complaint as a sanction for the plaintiff's falsehoods and stating that "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice"); *see also Combs v. Rockwell Int'l Corp.*, 927 F.2d 486,

1  488 (9th Cir. 1991) (holding that dismissal is an appropriate sanction for falsifying a
2  deposition and stating that "the court's inherent powers[] can be called upon to redress
3  such mendacity.").[2]

4  **III.    Mr. McKee.**

5  The Court is deeply troubled by the conduct of Mr. McKee in this case. It appears
6  that he submitted false declarations to the Court and impersonated Richard Adams on at
7  least one occasion, as described above. It also appears that he provided legal advice to
8  Adams without the supervision of a licensed lawyer. McKee also appears to have sought
9  to hide his involvement in this case through the false statements made in his declarations.
10  Because the Court understands that McKee is an attorney presently on inactive or
11  disability status with the State Bar of Arizona, the Court will mail a copy of this Order to
12  the State Bar.

13  **IT IS ORDERED:**

14  1.    Defendants' motion to dismiss (Doc. #27) is **granted**.
15  2.    All other pending motions are **denied as moot**.
16  3.    The Clerk is directed to mail a copy of this Order to the State Bar of Arizona.
17  4.    The Clerk shall **terminate** this action.

18  DATED this 9th day of December, 2005.

_____
David G. Campbell
United States District Judge

---

[2] The Court takes this action fully conscious of Adams' status as a *pro se* litigant. Courts traditionally and rightly accord *pro se* parties greater leeway than licensed attorneys. But this is not a matter of misunderstanding the law, the judicial system, or the rules of procedure. Adams knows the difference between truth and deception and the meaning of a sworn declaration. No litigant, including *pro se* litigants, should be permitted to engage in knowing deception of the courts. *See United States v. Flewitt*, 874 F.2d 669, 675 (9th Cir. 1989) (stating that pro se litigants are "subject to the same good faith limitations imposed on lawyers, as officers of the court").